**Declaration of Professor David W. Glazier**

I, David W. Glazier, hereby declare:

My name is David W. Glazier. I am over 18 years old, a citizen of the United States, and I am prepared to testify to the facts and opinions stated in this declaration if called upon to do so.

This declaration is a complete statement of opinions that I hold in connection with this case, as well as the bases and reasons for them, including information that I considered in forming my opinions. I am prepared to testify about the knowledge, skill, training, education, and experiences that I have acquired which informs my opinions, and the principles and methods I applied in reaching them.

**Background and experience**

I am currently an Associate Professor of Law at Loyola Law School Los Angeles where I teach courses that include the Law of War, International Law, and Foreign Relations Law. Based on its relevance to my ongoing research, I will be assigned to teach Constitutional Law I next year, focusing on national powers and federalism. My academic research has focused on issues related to the law of war, including the law of belligerent occupation and the authority of governments to try law of war violators, particularly through the use of military commissions. As documented in the attached *curriculum vitae*, I have written a total of six full-length law review pieces addressing these issues in whole or in part; five of these are currently in print and the sixth has been submitted for publication review.

I spent two years as a research fellow at the University of Virginia School of Law's Center for National Security Law prior to assuming my current position. During this period I created and taught law school courses on the Law of War and Military Justice, both of which were new additions to the Virginia curriculum.

I spent twenty-one years as a U.S. Navy surface warfare officer prior to attending law school, which included extensive practical and schoolhouse exposure to operational law and law of war issues. During this service I earned a Naval War College degree via the Washington D.C. seminar program and a master's degree in government with a certificate in national security studies from Georgetown University.

I was admitted to the Virginia State Bar in 2004 and am currently in an inactive status.

**Opinions**

I have been asked to state my opinion as to the applicability of federal law, specifically criminal violations specified in Title 18 of the U.S. Code, to foreign territory which was under military occupation by American armed forces.

The starting point for my analysis is an historical understanding of the development of the international law governing belligerent occupation and its subsequent and current implementation. The modern law of war, including particularly the subset known as occupation law, is of relatively recent origin. The seminal event in this modern legal development was the "Lieber Code" promulgated during the American Civil War. Written by Columbia University professor Francis Lieber, it was issued to the Union Army as General Orders (sic) No. 100 in 1863 under the title "Instructions for the Government of Armies of the United States in the Field." It included the earliest formal statement of laws governing military occupation, reflecting the influence of General Winfield Scott's conduct of the U.S. occupation of Mexico in 1847-48.

Scott, a lawyer before entering military service, recognized that he needed to secure Mexican popular acquiescence to the presence of his badly outnumbered army to achieve victory. Poor discipline, particularly among volunteer units, exemplified by numerous acts of pillage and even murder, was going to undermine this strategy. American military law of that era only criminalized actual military offenses such as desertion, disobedience of orders, and sleeping on guard duty, limiting prosecution of soldiers for common crimes such as robbery, rape, and murder to civilian law. But it was clearly understood that neither the limited U.S. federal criminal law of that time, nor any state criminal code, extended to conduct in another country, even where it was under the exclusive control of U.S. forces. So when a U.S. soldier murdered a Mexican national early in the conflict, the Secretary of War determined that the only permissible sanction was to discharge the offender and send him home.

Scott's solution to this dilemma was to use his authority as an occupying force commander under the law of war to promulgate martial law in the theater of his operations. Earlier sources had viewed martial law as a purely power-based authority, typically described as being merely the will of the commander rather than any formal system of law. Blackstone had said that it is "built on no settled principles, but is entirely arbitrary in its decisions." (William Blackstone, 1 Commentaries on the Laws of England 400 (1765)). Scott insisted on a more formalized application incorporating recognized American principles of due process. He drafted what was effectively a penal code in the form of a martial law order that defined punishable offenses. The original version, General Orders No. 20, was read to all U.S. forces entering Mexico, and subsequent versions were translated into Spanish and provided to the local populace before taking effect as well. The order applied to conduct between Americans, and to interactions between Americans and Mexicans. Mexican-on-Mexican crimes were left to local authorities to deal with under local law, left in force for that purpose.

Although the territory occupied by General Scott was subsequently returned to Mexican rule, the United States ended up receiving substantial territorial concessions, including the New Mexico territory and California. Laws and government institutions established by the military commanders in those territories remained in force until Congress explicitly legislated their incorporation as U.S. territories. As late as the mid 19th century, many European countries held that military conquest was sufficient to create sovereignty over captured territory and it would thus be permissible to extend the occupier's national laws to such areas when they were first occupied. As exemplified by American conduct during the Mexican War, the U.S. government explicitly rejected this view, becoming a leading early proponent that sovereignty could only be acquired through a formal post-war agreement. The American view was explicitly adopted as a rule of international law by the end of the 19th century.

Lieber's directive reflected the strong influence of earlier views of martial law tempered by Scott's more enlightened approach. His "code" still asserted that "martial law is simply military authority exercised in accordance with the laws and usages of war" but it called upon commanders to be "guided by the principles of justice, honor, and humanity" in its execution. It stated that local civil and penal laws remained in place unless the commander specifically considered that military necessity required their suspension or the dictation of replacement rules. Nothing in his text provided for the extension of the occupier's ordinary domestic law into captured territory. The code also stated what is now known as combatant immunity, the principle that a soldier cannot be subject to ordinary criminal prosecution for acts of violence committed during hostilities.

The Lieber Code strongly influenced the 1899 and 1907 Hague Regulations Respecting the Laws and Customs of War on Land, via the intermediate step of the unratified 1874 Brussels Declaration. The Declaration omitted Lieber's words about martial law being mere military authority and called for an occupying power to leave the occupied state's peacetime laws in force unless changes were "necessary."

The subsequent Hague Conventions adopting the Land War Regulations were widely ratified at the time. Ultimately, the International Military Tribunal at Nuremberg held in 1946 that the 1907 Land Warfare Regulations had become customary international law prior to the outbreak of World War II and were thus binding on all nations. These provisions retain their binding effect to this day. The Hague Land Warfare Regulations provide basic guidance for the conduct of belligerent occupation, requiring the occupier to restore order and public life, to safeguard public property, and to respect existing laws unless changes were absolutely necessary. The Regulations also remain the authoritative source for a number of other currently effective law of war provisions, including the combatants' immunity from prosecution under any other nation's domestic law for acts committed in the course of fighting.

As a result of the Spanish-American War, the United States became an occupying power in Cuba, Puerto Rico, and the Philippines. The Army found itself called upon to govern these territories and, as Scott had done in Mexico, commanders promulgated martial law orders and conducted trials by military commissions for their violation. Normally occupation/martial law authority was considered to end with the formal conclusion of peace. But even though Spain ceded the Philippines and Puerto Rico to the United States by the peace treaty ratified in April 1899, the United States considered the territories to remain under military

2

authority until Congress explicitly extended U.S. civilian rule to them. This result was upheld by the U.S. Supreme Court in Santiago v. Nogueras, 214 U.S. 260 (1909).

The United States also found itself an occupying power in the Rhineland after World War I, and in parts of North Africa, Sicily, Italy, Germany, and Japan after World War II. The U.S. initially left local law fully in place in North Africa, but this resulted in the unpalatable situation of American officials enforcing Axis legal rules that included explicit anti-Semitic provisions. So U.S. commanders issued orders modifying local law to conform to higher standards of equal protection in all subsequent occupations. But in no case I have found was any substantive American law ever held to be directly applicable to occupied territory. Even in the last effort at applying WWII occupation justice, the 1979 trial of the East German hijacker of a Polish airliner in West Berlin, which was still technically under Allied military authority, an American civilian judge controversially ruled that U.S. criminal procedure, including the right to jury trial, would apply, but not substantive U.S. law. The actual criminal charges in the case, United States v. Tiede, 86 FRD 227 (U.S. Court of Berlin 1979), were drawn from West German law.

The aftermath of World War II saw the substantial expansion of that branch of the law of war known as International Humanitarian Law. The principle vehicle for this expansion was the four Geneva Conventions of 1949, each specifying formal humanitarian protections for a defined category of individuals who either were never, or were no longer, direct participants in armed conflict. The first three conventions, covering the sick and wounded in the field (Geneva I), at sea (Geneva II), and prisoners of war (Geneva III), were updates of previous international treaties. The final convention (Geneva IV) covered civilians, marking the first ratified accord specifically focused on this subject.

Geneva IV includes substantial coverage of occupation law but Article 154 is understood to declare that these provisions supplement rather than replace those found in the Hague Regulations. Geneva IV's protections extend to any civilian (essentially any person not covered by Geneva I, II, or III) who qualifies as a "protected person." In the case of occupied territory, this simply means any individual who is not a national of the occupying power or a co-belligerent. Although the Netherlands did deploy approximately 1,100 military personnel to Iraq from July 2003 until March 2005, the Dutch government made it clear that these personnel responded to the United Nations Security Council resolution 1483's call for a Stabilization Force and were not part of the U.S. occupation authority. It is thus my opinion that a Dutch national does not fall within the co-belligerent exception of Geneva IV and would properly be classified as a protected person.

Geneva IV contains a number of new rules expanding the scope of international law governing occupations. Article 49, for example, bars the transfer or deportation of any protected person from the occupied territory to either the territory of the Occupying Power or any other country, "regardless of their motive." If the Occupying Power considers it necessary to modify the penal laws applicable in the occupied territory, Article 65 mandates that changes cannot be enforced until "they have been published and brought to the knowledge of the inhabitants in their own language" and that their application cannot be retroactive. Any breach of penal laws also must be tried in the occupied territory; Article 66 allows use of a "properly constituted, non-political military court" for this purpose. Although Geneva IV generally expands the scope of law regulating occupation, Article 6 did limit a number of its provisions in this area to a one-year period. (This temporal limit was removed, however, by Article 3(b) of the 1977 Additional Geneva Protocol I).

The four Geneva Conventions of 1949 each contain an article identifying provisions whose violation constitute "grave breaches." These provisions are found in Article 130 of Geneva III and Article 147 of Geneva IV. The particular significance of a grave breach is that the conventions require that all parties to the treaties must comprehensively criminalize these offenses under its national law and are obligated to locate and try any such violators before its national courts. In other words, grave breaches of the Geneva Convention are intended to be subject to universal jurisdiction.

Responding to these provisions, the United States enacted the War Crimes Act of 1996, codified at 18 U.S.C. 2441, which makes any grave breach of the conventions, as well as several specific violations of the Hague Land Warfare Regulations, felonies prosecutable in U.S. federal courts. This statute falls short of

3

the universal jurisdiction called for by the conventions, however, limiting its applications to cases where either perpetrator or victim is an American national.

The Geneva Conventions apply in toto only to international armed conflicts, defined by the wording of Article 2 as "armed conflict which may arise between two or more of the High Contracting Parties . . . [and] to all cases of partial or total occupation of the territory of a High Contracting Party." Because the Geneva Conventions have now achieved essentially universal status, being ratified by 194 nations (there are 192 UN member states), they will apply in full to virtually any conflict between actual nations.

There has been a great deal of confusion and misunderstanding about the conventions' applicability in the so-called "war on terror." But there should be no grounds for confusion about the Geneva Conventions' applicability to the conflict in Iraq at issue in this case. The Iraq war is legally distinct from the so-called "war on terror," having been authorized by separate congressional action in the fall of 2002, the Authorization for Use of Military Force Against Iraq Resolution of 2002, Public Law No. 107-243. The invasion of the sovereign nation of Iraq by the United States, both of which were and are parties to the four Geneva Conventions of 1949, indisputably invokes the full scope of their coverage.

In 1977 two additional international protocols were completed to update the 1949 conventions and address actual or potential coverage gaps. The first Additional Geneva Protocol (AP I) applies to international armed conflicts, supplementing the full Geneva Convention coverage. Additional Protocol II applies only to non-international conflicts. The United States takes issue with several provisions of AP I and President Reagan announced in 1982 that he would not submit it to the Senate for advice and consent to its ratification. Iraq also never became a party to AP I, so it does not apply to the current conflict as treaty law. Nevertheless, 164 other states – a substantial majority of the current world order – have ratified it, including the United Kingdom, the Netherlands, and virtually all U.S. allies. U.S. government officials have indicated that many of its provisions should be considered binding on all nations as customary international law. (Examples include Department of State Deputy Legal Advisor Michael Matheson's speech at American University, Jan. 22, 1987 *reported in* 2 Am. U.J. Int'l L & Policy 419 (1987), and William H. Taft, IV, *The Law of Armed Conflict After 9/11: Some Salient Features*, 28 Yale J. Int'l L 319, 322 (2003).) So most of AP I should also be applicable to the Iraq conflict as being declaratory of customary international law.

One of the AP I provisions most relevant to occupation law repeals the one-year limit on its application found in Geneva IV. There has been no U.S. objection to this provision of which I am aware, and a number of past U.S. occupations, including those of Germany and Japan which were in progress at the time the Geneva Conventions were adopted, extended well past one year. Moreover as noted above, the U.S. Court in Berlin oversaw a trial in German territory as late as 1979. Accordingly the United States has demonstrated its reliance on the AP I rule comprising customary international law.

Actions and statements of U.S. officials indicate that the United States considered itself an occupier of Iraq under international law. The U.S. and British Ambassadors to the United Nations jointly sent a letter to the President of the Security Council pledging that their countries would "strictly abide by their obligations under international law" and stating that they had created the Coalition Provisional Authority (CPA) to administer Iraq. (U.N. Security Council document S/2003/538). The U.N. Security Council responded by enacting Resolution 1483, explicitly noting the status of these "states as occupying powers" and calling for adherence to the requirements of the Geneva Conventions and Hague Regulations. The CPA itself, under the direction of its Administrator, L. Paul Bremer, acknowledged the U.S. role as occupiers and its obligation to comply with accepted principles of international occupation law. CPA Order no. 7, issued on June 10, 2003 declared that the existing Iraqi penal code remained in force with the exception that the death penalty and prosecution of some crimes would be suspended. Certain specified other offenses previously used to stifle dissent could only be prosecuted with explicit CPA approval. CPA Order no. 17 exempted most foreign civilian and military personnel working in Iraq from Iraqi criminal prosecution, holding them liable only to the sending state's own laws. But neither this order nor any other directive that I have found authorized the extension of U.S. national law to Iraqis or to anyone else not a national of that state.

4

Clearly an occupying power must be concerned with the protection of its own forces, and the law of war grants considerable flexibility in this realm. First, opposition fighters who qualify as combatants may essentially be killed on sight at virtually any time and place, while civilians who unlawfully participate in hostilities may be taken under fire any time they are so engaged. When a combatant is captured, he or she may be detained for the duration of hostilities as a prisoner of war in accordance with Geneva III based simply on establishing their affiliation with the enemy's forces. Civilians posing a security threat may also be preventively detained but here Geneva IV's Article 43 requires an initial judicial or administrative review as soon as possible and reconsideration of the continuing need for the detention at least every six months. Even while formally denying it is an occupying power in the West Bank, for example, Israel does in fact provide exactly this type of review for its security detention of Palestinians.

The occupying power is not limited to preventive detention. An individual qualifying as a combatant enjoys immunity from prosecution under ordinary domestic criminal laws, but may still be tried for any law of war violation (war crime) that they may have committed. Geneva III Article 102 restricts their trial to the same courts as members of the detaining power's own armed forces, however. A civilian who participates in hostilities gains no similar immunity and is therefore subject to trial under the criminal law in effect locally. In the case of occupied territory, this may be either the existing law of the occupied nation, or supplemental or superseding rules laid down by the occupying power and provided to the local populace in advance of their enforcement.

Although international law, traceable directly back to General Scott's conduct in Mexico, clearly allowed the United States to establish non-political military courts to try criminal violations in Iraq, the United States unilaterally elected not to do so, relying on Iraqi courts to enforce local laws subject to the specific modifications made in CPA directives. Based on the historic practice and the current state of occupation law, it is my opinion that there is no precedent or legal basis in the contemporary law of war/occupation law authorizing the direct application of the occupying power's domestic law to occupied territory, other than to the occupying power's own nationals, unless this law is clearly announced to the occupied population in accordance with Geneva IV article 65. I am not aware of a single instance in the United States' 230 plus years of existence in which a foreign national has been prosecuted in domestic U.S. courts for crimes committed in occupied territory.

Other factors suggest that it is unlikely that Congress would have intended the terrorism related provisions at issue in the case, for example 18 U.S.C. 2332, to apply to a combat zone or area under military occupation. First, at the time the statute was enacted in 1986, there was no precedent for considering terrorism to fall within the definition of armed conflict. The September 11, 2001 attacks on the World Trade Center and Pentagon marked the first time that a terrorist incident was considered to rise to the level of an armed conflict. But I think that even more compelling grounds for this conclusion can be found by considering the statute in light of the law of armed conflict.

(1) First, § 2332 makes no effort to assert a broad victim based jurisdiction. The codified offenses are limited to those encompassed within acts of terrorism, with the statute requiring Attorney General certification that the act "was intended to coerce, intimidate, or retaliate against a government or a civilian population." Applying § 2332 to situations of armed conflict would have the impermissible effect of potentially criminalizing all acts of violence committed by adversaries in the conflict, limited only by the whims of the Attorney General. As military theorist Carl von Clausewitz famously observed, war is a "continuation of politics by other means." The only legitimate purpose of war is to coerce a government to yield to the political goals of the adversary; every killing or act of violence in an armed conflict must be ultimately directed towards this objective to be lawful. In recognition of that fact, the law of armed conflict specifically immunizes the combatant from prosecution under the domestic laws of adversary nations, limiting their prosecution to the law of war (and now under Geneva III expressly limiting their trial to the same courts that try the detaining nation's own military personnel). Given the Charming Betsy canon of statutory interpretation, Murray v. The Schooner Charming Betsy, 6 U.S. (2 Cranch) 64 (1804) ("[A]n act of Congress ought never to be construed to violate the law of nations, if any other possible construction remains...."), § 2332 should best be read to be inapplicable in situations of armed conflict and military occupation, both of which constitute subsets of the law of war.

5

(2) The issue with customary international law immunizing combatants from prosecution under ordinary domestic law could be sidestepped by holding § 2332 to apply only to persons who are not lawful participants in hostilities, that is, to civilians. But that is actually even more problematic given that such persons are covered by the protections of Geneva IV. The mere act of transferring such individuals to the United States for trial would violate the explicit Geneva IV prohibition against deportation from occupied territory found in Article 49, which is specified as a grave breach under Article 147. Given that Congress made all grave breaches of the Geneva Conventions federal felonies in the War Crimes Act of 1996, codified at 18 U.S.C. § 2441(c)(1), it would be incongruous to find congressional intent to have § 2332 apply in situations where its application would make the U.S. officials enforcing the statute by seeking to transfer indicted individuals into felons. This result is easily avoided by simply reading the extraterritorial application to exclude the actual loci of armed conflict or military occupation, where the law of war would logically prevail as *lex specialis*.

(3) A state of war between two nations logically terminates the extraterritorial application of statutes criminally proscribing the killing of nationals or destruction of national property – while such acts are universally condemned in peacetime, they are in the basic function of combatants in wartime. The exercise of military occupation is itself an exercise of legal authority found in the international law governing armed conflict; it is only justified while a state of war remains in effect, which persists until a formal peace is concluded. It would thus be illogical to conclude that anyone in occupied territory could be on constructive notice that they are subject to the extraterritorial application of the domestic laws of the occupier when such application is severed by the outbreak of hostilities. The only exception would be if the occupier specifically gave the local populace notice in accordance with the requirements of Article 65 of Geneva IV that they were subject to such laws. But that did not happen in Iraq. Thus under international law, an Iraqi or third party foreign national is not properly liable to prosecution under general provisions of U.S. criminal law.

Based on my knowledge of international law, the law of war, and U.S. foreign relations law, it is my opinion that the defendant in this case is not validly subject to U.S. federal jurisdiction for the conduct charged under the domestic criminal code of the United States. This conclusion that he cannot be tried by the federal government is consistent with actual U.S. conduct in Iraq. Based on past U.S. practice, the customary law of war, and the express provisions of Geneva III and IV, the CPA could have exercised jurisdiction over both foreign national military and civilian personnel in Iraq through the use of U.S. military courts, but elected instead to rely exclusively on Iraqi and foreign national courts to prosecute all criminal violations. Since the defendant is a national of the Netherlands, that country should be free to try him for the alleged conduct if it has exercised its right to criminalize such conduct extraterritorially under what international lawyers call the "nationality principle." And regardless of the defendant's nationality, Iraq should be free to try him for conduct within its territorial jurisdiction given that the Iraqi penal code remained in effect throughout the time of his alleged actions.

I declare under penalty of perjury that the forgoing is true and correct. Executed on February 18, 2009.

_____
David W. Glazier
Associate Professor of Law
Loyola Law School Los Angeles
919 Albany St.
Los Angeles, CA 90015-1211

6