**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | **Criminal No. 05-337 (PLF)** |
| v. | : | |
| | : | |
| WESAM AL DELAEMA, | : | |
| also known as | : | |
| WESAM KHALAF CHAYED DELAEME, | : | |
| | : | |
| Defendant. | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States, by and through its attorney, the United States Attorney for the District of Columbia, respectfully files this Sentencing Memorandum.

**I.      Introduction**

This case represents the first use of the United States criminal courts to prosecute an individual for terrorism offenses against Americans in Iraq. From beginning until end, the normal rights and procedures of our criminal justice system have been applied to the defendant and his criminal activities. In September 2005, a grand jury sitting in the District of Columbia considered sworn evidence and found probable cause to indict the defendant for six terrorism offenses. The United States applied to the Netherlands for the defendant's extradition, invoking our extradition treaty. Just as in other extradition requests to the Netherlands involving Dutch citizens, the United States agreed that, upon the defendant's conviction and sentencing, should the defendant apply to serve his sentence in the Netherlands, the United States would not oppose his transfer for such a purpose. The United States likewise assured the Netherlands that the defendant would be prosecuted in an Article III criminal court, with all the rights of any defendant in our criminal justice system, and not in any other forum. In the Netherlands, the defendant was represented by experienced

counsel, who vigorously fought against his extradition.  Indeed, during those proceedings, the capacity of the United States criminal justice system to treat the defendant fairly and humanely was repeatedly under attack.  In December 2006, the International Human Rights Clinic at the Human Rights Program of Harvard Law School filed an *Amicus Curiae* brief in the Netherlands in which it argued that "[d]espite U.S. diplomatic assurances, there is a real risk that, due to his identity as a Muslim male accused of terrorist crimes, Mr. Al Delaema will be subjected to inhuman or degrading treatment [in the U.S.], in contravention of Article 3 of the Convention for the Protection of Human Rights and Fundamental Freedoms."

The Dutch courts eventually rejected such attacks on the ability of the United States criminal justice system to treat the defendant fairly and humanely, and the defendant was extradited here in late January 2007.  Despite the dire predictions made on behalf of the defendant in the Netherlands, the defendant received the full panoply of rights and procedural protections afforded every criminal defendant in the United States.[1]  He was appointed highly experienced defense counsel, with vast experience in international terrorism cases, who represented him zealously throughout the prosecution.  Voluminous discovery was provided to the defense by the government.  The defense filed several legal motions challenging the government's ability to bring this case in federal court and seeking to suppress the Dutch wiretap evidence and the statements of the defendant taken by the Dutch police.  In October 2008, a week-long evidentiary hearing was held, at which Dutch law enforcement officials were called as witnesses by both the government and the defense.

---

[1]     While the defendant has been treated humanely and fairly while in the United States, after December 2007, he was also kept separated from other prisoners, given that he joined with other prisoners in the brutal beating of a jail guard.  The defendant has separately pled guilty in D.C. Superior Court to Aggravated Assault for that incident as part of the global disposition of this matter.  Still photos from the videos of that assault are attached as **Exhibit A.**

In November 2008, this Court heard extensive oral arguments on the pending legal motions and then set forth on the record its reasons for denying those motions. Among others, the Court rejected the defense arguments that: (1) this prosecution violated the Geneva Conventions; (2) Congress did not intend the charged offenses to apply extraterritorially to someone such as the defendant, whose offenses were alleged to have occurred in Iraq during a period of conflict and/or occupation; (3) the Attorney General certification provision of 18 U.S.C. § 2332(d) improperly removed the element of intent from the jury; (4) the Dutch wiretap evidence should be suppressed because it was not obtained in accordance with our own wiretap laws; and (5) the defendant's statements to the Dutch police should be suppressed because they were coerced by the Dutch police. Instead, this Court ruled, *inter alia*, that the Geneva Conventions did not apply to the defendant, particularly given that he was arrested in the Netherlands and lawfully extradited to the United States. The Court also concluded that Congress <u>did</u> intend for the charged offenses to apply extraterritorially – *i.e.*, to acts taking place outside the United States. Moreover, the Court concluded that, even if the Geneva Conventions were to apply to the defendant, potential jurisdiction for offenses under the laws of war would not preclude concurrent jurisdiction in a United States criminal court.[2] Concerning the Attorney General certification provision of 18 U.S.C. § 2332(d), rather than view it as an abridgement of the defendant's rights, this Court concluded that it was an added protection provided by Congress for those accused of international terrorism. Finally, assessing the evidence that it had heard in October, the Court concluded that neither the Dutch wiretap evidence nor the defendant's statements to the Dutch police should be suppressed, and it found that those

---

[2]    As part of the plea agreement, the defendant has reserved the right to appeal the Court's denial of his motion to dismiss on the grounds of lack of jurisdiction.

statements had not been coerced.

Now the defendant, Wesam Al Delaema, has freely admitted his guilt and pled guilty to Count One of the Indictment, charging him with Conspiracy to Murder United States Nationals Outside the United States, in violation of 18 U.S.C. § 2332(b)(2). He has signed and adopted under oath a 5-1/2 page statement of the offense, setting forth agreed-upon facts supporting his plea. The parties, under Federal Rule of Criminal Procedure 11(c)(1)(C), have agreed to a 25-year sentence for the defendant's offense. Under the agreement between the United States and the Netherlands, the defendant will ultimately be transferred to the Netherlands, where a Dutch court will determine his appropriate sentence under Dutch law.

Given the significance of this international terrorism prosecution, as well as the core principles of openness and transparency that are fundamental to our criminal justice system, it is important that the Court's adoption of the agreed-upon 25-year sentence of the defendant be based not simply on a 5-1/2 page factual proffer. Rather, the Court's sentence should be based on a fair assessment of the totality of the evidence against the defendant, which should be part of the public record of this case. This Memorandum and the government's allocution at sentencing will attempt to fulfill this goal.[3]

---

[3] In his Sentencing Memorandum, filed this morning, the defendant notes his "disagreement with the twelve point upward adjustment under U.S.S.G. § 3A1.4 " for "a felony that involved, or was intended to promote, a federal crime of terrorism. *See* Defendant's Sentencing Memorandum at 2-3. He asserts that "the particular facts of this case [do not] satisfy the required finding under § 2332b(g)(5)," *id*. at 3 – *i.e.,* that the offense "is calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct." *Id*. First, contrary to the defendant's outlandish assertion, the fact that the defendant committed a "federal crime of terrorism" is more than amply established by the statement of the offense which the defendant adopted under oath. Second, the mere fact that the defendant would raise this issue as a matter of dispute – albeit one he argues that the Court need not resolve – provides further justification for the merits of a fulsome exposition of the

## II.    Defendant's Background

The defendant was born and raised in Fallujah, Iraq.  In January 1993, one month shy of his 20th birthday, the defendant was arrested by Greek military police on the island of Lesbos, Greece, for entering the country illegally from Turkey.  The defendant was sentenced to eight months in prison in Greece.  He sought asylum in Greece, but his petitions were denied.  The defendant arrived in the Netherlands in December 1993, seeking asylum.  On his immigration application in the Netherlands, he failed to disclose his time in Greece, including his arrest and his asylum applications there.  This omission was not discovered by the Dutch until after the defendant's current arrest.  In 2001, he was granted Dutch citizenship.

By all appearances, the defendant became assimilated into Dutch society.  He learned to speak Dutch; he became employed as a hairdresser; and he also worked part-time in an auto repair garage.  His lifestyle appeared quite westernized, including Dutch friends and girlfriends.

When U.S. and Coalition Forces invaded Iraq on March 19, 2003, the defendant had a strong reaction.  Three days later, on March 22, 2003, he attended a large rally in Amsterdam to protest the war.  During the course of the rally, the defendant literally ended up on fire, requiring nearby friends and family to quell the flames.  A local police official who spoke Arabic was in the crowd, observed the commotion and responded to the scene.  Her report stated, in relevant part, as follows:

> I saw that a young man was on fire.  Subsequently, I noticed that the boy lay down on the ground.  Immediately after this I saw a group of people kicking this guy.  At first I was under the impression that these people were beating him up.  Then, suddenly I heard in the Arabic language that this boy had set himself on fire. . . . Then we all helped the boy to get back on his feet and took him away from the crowd. . . . **Wissam [*sic*] stated that he, with the aid of gasoline, had set**

government's evidence as part of the sentencing proceeding.

**himself on fire to show Bush what he was doing to the world.**  At the ambulance I heard Wisam's [*sic*] family reacting angrily at him, why he had done this, it showed that they knew nothing.  Wizsam [*sic*] was taken to the VU [Free University Hospital].  He had third degree burns on his hands and second and third degree burns on his face.

(Emphasis added.)[4]

Six days later, the defendant was interviewed on camera, in English, by Canadian journalist

Katerine Brisebois.[5]  That interview included the following exchanges:

Brisebois:     What happened to your face and, uh, your fingers?

Delaema:     I burned myself, uh, and ah, how you, how you call it? In an, in a "demonstratie" [demonstration], in a demonstration, in Amsterdam, with uh, with uh, with uh, benzene [gasoline] you know, with fire.

Brisebois:     Why?

Delaema:     Because I am mad with what happen now in my country. Because of America and Britain kill our people and destroy our country.

\* \* \*

**I'm a proud that I did this, you know,** and I, I, I, to do something, to show the people that we have a problem in our, and uh, ple-, and to please all the world to help us from all American attack and British.

(Emphasis added.)  A week later, Brisebois returned to continue the interview:

---

[4]     The English translation of the report is attached as **Exhibit B**.

[5]     The original interview(s) by Brisebois did not air on television, but after the United States declared its intention to seek the defendant's extradition, a Dutch news magazine show "NOVA" aired excerpts from the interview as part of a story on the defendant on August 4, 2005.  We have attached as **Exhibit C** the transcript of these excerpts.  At sentencing, we intend to play the video excerpts and make them part of the public record.

| Delaema: | The American and British come to our country, don't want to that we be free just want to stole the oil, and everybody know that, you know?  And uh, so Americans also now kill our people with the bombing. The most important thing for America now to win the war but don't think about innocent people and children and womens. |
|---|---|
| | * * * |
| Brisebois: | You wanted to, eh, kill yourself, or? |
| Delaema: | Ah, yah, kill myself, **I don't care if I kill myself or not, I, I want to be sacrificed for my country, for my people,** because uh, I don't, I'm no different like the people you of what see on "televisie" [television]: the children, the, the womens, the old people to die because the war of America. |

(Emphasis added.)  Whether the defendant really did purposely set himself on fire is an open question.  Some of his friends have suggested that he accidentally caught on fire due to his proximity to a burning flag.  The pattern of his injuries – *i.e.*, burns to the hands and face – is probably more consistent with this accidental theory then his claim that he doused himself with gasoline.  What is significant is not whether he really purposely set himself on fire but, rather, the fact that he wanted everyone to think that he had – from the police officer arriving on the scene while he was still smoldering to the television reporter who interviewed him six days later and then a week afterward.

### III.    October 2003 trip to Iraq

In October 2003, the defendant drove from the Netherlands to Iraq, through Turkey and Syria. He took the trip with Kahten Al Naeme, his friend and employer at the auto repair shop.  The two drove in separate cars.  One of the purposes of the trip was allegedly to sell the cars.  The defendant took along a video camera and videotaped much of the trip.  Indeed, when he was driving alone in his car, he often alternated between pointing the camera at himself and at the roadside scenery.  In

the shots of himself, it was clear that he was wearing on his right hand a bandage/half-glove that was still necessary as the result of his burn injuries seven months earlier.[6]  Based on the scenery shots in Turkey, an imagery expert at the Department of Defense has been able to determine the defendant's route of travel through Turkey and to assess a possible route of travel through Syria to Iraq.[7]

After he arrived in Iraq, some time around October 24, 2003, the defendant married Zina Jabbar Bedewi in Baghdad.  By October 30, 2003, however, the defendant was in Fallujah, engaged in far different activity, as shown by his own videotape.[8]

The key segment of the videotape begins with a date/time stamp of 30 October 2003 at 23:07:50 (*i.e.*, 11:07 p.m.).  The video is shot with a night vision lens, initially showing three men standing in stark surroundings.  Because of the night vision lens, all clothing appears white or light-colored.  Each of the men is shown with his face and head covered with a hooded mask, with an inscription in Arabic written across the forehead.[9]  The defendant is not seen during this initial segment because he is the cameraman.  Each of the three men, beginning with the man standing on the left, gives a *jihadi* speech in Arabic, denouncing the American presence in Iraq.[10]  The first man's speech is the longest, with highlights including the following:

---

[6]    All of the video materials discussed were subsequently recovered during the search of the defendant's home on the date of his arrest, May 2, 2005, as discussed *infra*.

[7]    Maps of these routes are attached as **Exhibit D**.

[8]    A collection of still photos taken from this video, with English subtitles, is attached as **Exhibit E**.  At sentencing, we intend to play excerpts from this video and make the video part of the public record.

[9]    The Arabic inscription is translated as: "There is no god but Allah and Mohammed is his prophet."

[10]    A full English transcript of this videotape is attached as **Exhibit F.**

> In the name of Allah, Most Gracious, Most Merciful. . . .  We, the Mujahideen of the city of Fallujah, mother city of mosques, are waging Jihad in defense of our faith, our property, our honor and the honor of all Muslims. This resistance that is being waged now in the city of Fallujah, we are all Mujahideen in it. . . . Presently, we are fighting this Jihad against the Americans, who devastated us and our families, raiding our houses and families. . . . We are the Mujahideen of Allah. We pledge to continue the fight "till the Day of Resurrection."  God willing.

**Exhibit E**, at E1- E7.  The defendant echoes this speech from the background by exclaiming, in Arabic, "God willing!"  *Id.*, at E8.  Then the camera shifts to a second man, who is armed with an assault weapon slung over his shoulder.  He gives a shorter speech, highlights of which include the following:

> With the help from Allah, we will drive the American forces out for the Iraqi people. . . .  Our resistance has been going on in Fallujah and about 30 U.S. soldiers have died and no TV station reported it. We have destroyed about 10 U.S. Army vehicles on the Mahmudiya – Baghdad road. If each of these vehicles was carrying at least five soldiers, you do the math. . . .  We call upon all Arab countries not to send even a single soldier to Iraq.  If they do, their soldiers will die as infidels, as Jews.

*Id.*, at E9- E11.  In response to this speech, the defendant says, in Arabic, "Thank you.  May Allah bless you."  *Id.*, at E12.  He then beckons a third masked and hooded man to speak, saying, "Mujahid, do you have something to say?"  *Id.*, at E13.  The third man follows with a speech of his own, highlights of which include the following:

> In the Name of Allah the merciful, the compassionate.  On behalf of all the people of Fallujah and on my own behalf, we declare Jihad against the Americans because the Americans are enemies of Allah and his prophet. . . .  We do not need any foreign participation from anyone, be it European or Arab. We Iraqis are up to the task and we resolve to fulfill this promise.

> Allah is great, Allah is great, Allah is great.  Death and shame to the Americans.  Long live the Iraqi nation.  Long live the banner of "Allah is great."  And the outcasts will be driven away!

*Id.*, at E14.

After this third speech has concluded, the defendant can apparently no longer bear to remain behind the camera.  He can be heard in the background asking an unknown male to film and providing brief instructions on how to do so.  The defendant then walks from behind the camera into the picture wearing a hooded mask, like his fellow *mujahideen*.  He is wearing a distinctive western-style sports jacket, which makes him easily recognizable throughout the remainder of the video.[11] Without prompting, the defendant launches into the following speech (in Arabic):

> Delaema:      We, the Mujahideen of Fallujah, have a plan, God willing, for today. With God's help, and if the Americans enter, we will hit them with timed mine, by way of remote [overlay].
>
> Conspirator:  On the Fallujah Way.
>
> Delaema:      Controlled by remote from afar. God willing, if the hit is successful, we will hunt them.
>
> Conspirator:  We will conclude the speech there.
>
> Delaema:      We will show you, in a short while, the site where we hide the mines and how the operation is conducted. The operation will be carried out, if Allah wills, today, and if they [the Americans] come. This is not the first operation we carry out. We have executed several operations and most of them were successful. The American Army wouldn't admit to casualties. Their casualties have gone beyond your imagination. In Fallujah

---

[11]      In later portions of this videotape, the defendant's bandaged/half-gloved right hand is clearly visible.  There was never any question that this hooded figure was the defendant, as he admitted so to the Dutch police.  *See* May 11, 2005, interview of Defendant, at 45:02, attached as **Exhibit L.**

> alone, they lost hundreds. Thanks be to Allah, all this happened with His help and blessing. We will continue this struggle and keep our promise, God willing, until the liberation of Iraq is achieved.

**Exhibit E**, at E18- E30.

Following the defendant's speech, the video cuts to a scene in which six men, including the defendant, are visible in the same stark setting at night, each wearing a hooded mask. This shot is similar to a "team photo," in that three men stand in the back, while three men sit or crouch in the front, including the defendant, who kneels in the front on the right, with his arm around the shoulder of the man in the middle of the front row. *Id.*, at E31. During the "team photo," the camera pans back and forth over the group several times. Each of the men shown, including the defendant, are silent, as the cameraman provides a long *jihadi* speech along the same lines as the prior speeches.

The video then cuts to an outdoor scene, again shot with a night vision lens. The footage initially shows a hooded, masked subject using his hand to unearth a large artillery shell buried beneath a dirt and gravel road. This individual is soon joined by the defendant, who assists in the unearthing with his bandaged/half-gloved hand. The defendant and his co-conspirators discuss and demonstrate, on video, the way in which the improvised explosive devices (IEDs) that they had buried in a road in or around Fallujah would be detonated and would destroy the American vehicles driving on the road and kill the American occupants of those vehicles. The defendant and one of his co-conspirators have the following conversation, as they demonstrate the components of an IED buried in the road:

Delaema:    We are now digging in the sand for mines.

Conspirator:  This is the IED.

Delaema:       This is the IED?

Conspirator:   Yes, this is it.  We filled it with TNT.  Now, when the American vehicles approach, this is the signal.  When the first Jeep arrives here, we, with the instrument from 500 meters away, will press [a button] on the device, which is connected with an electric wire, and it will detonate the mine.

Delaema:       Yes.

Conspirator:   We'll have the remote in our hands.  We're making these devices with our own hands.  We'll detonate the mine from about 500 meters and, God willing, we'll not sustain any casualties.

Delaema:       God willing.

Conspirator:   Anyone who gets in here will never come out safe. . . .

Delaema:       Muhammad, film it. . . .  So this is the IED.

Conspirator:   Yes, this is it.

Delaema:       God willing, they'll pass by here today. . . .

Conspirator:   When they come this way tonight, God willing, nobody will come out safe.  Of course, this is not the first operation we carry out.  We have had many successful ones.  Most of the IEDs that we use, we bury them in the ground.  We can even stuff them inside animals.

Delaema:       This should be a successful operation.

Conspirator:   God willing, this operation will be 100 percent successful.

Delaema:       God willing.

Conspirator:   We didn't have an operation that wasn't successful.

Delaema:       This is an[other] IED.  Film the ground.

Conspirator:   Now, we have the wire extended here.  The distance between them should be about 10 meters.

Delaema:       OK.

Conspirator:    So that the explosion is powerful and 100% accurate. Our job is neat and professional. We can even stuff animals [with explosives]. Let me show you the second one. . . . This is the second IED. We make them in our town with our hands, using TNT dough and electric capsule. These materials are never in short supply, because warehouses are full of them.

Delaema:    This is capable of destroying [overlay].

Conspirator:    It can destroy even an armored vehicle.

Delaema:    With the help of Allah.

Conspirator:    A very powerful IED. You don't know how much the Americans wanted to know its secrets. They used their instruments that they say are so advanced that they can detect things under the ground. Yet they couldn't detect our devices at all. . . .

Delaema:    God willing, and with God's help, we'll wait for them here, off the speedway. If they come we have a device that allows us to hit them, while they are unable to strike back.

Conspirator:    We'll suffer no casualties whatsoever. The instrument that we use can be operated 500 meters away.

Delaema:    Long range, long range!

Conspirator:    Yes, long range, very long. So far, we in the resistance didn't suffer any losses in the struggle against American forces since they entered Iraq. No casualties among Mujahideen at all.

Delaema:    And their deaths are in the hundreds! . . .

Conspirator:    Yes, in the hundreds How many of their convoys have been attacked! . . . Americans are the devils. We challenge them to pass by this place! We challenge them everywhere, on all outside roads. . . . So see, with resolve from Allah and the prophet Mohammad and from all of the martyrs, we're going to avenge all our martyrs. We'll take a hundred from America for every one that we lose.

Delaema:    God willing.

> Conspirator:     . . .  Killing one American soldier is worth the whole world to us. God willing, we'll be victorious, and we'll rid Iraq of every American.

*Id.*, at E32-E37.

In September 2005, these video materials and transcripts were provided to FBI Supervisory Special Agent (SSA) W. Mark Whitworth, an expert in explosives and hazardous devices, who examined these materials and issued a report.[12]  SSA Whitworth concluded that, between the video images and the conversation, all the necessary components of an IED were either shown or discussed in the video, with the exception of a power source.  He concluded that the components shown or discussed in the video indicated an electrically-fuzed IED, consistent with the types of roadside IEDs then being used in Iraq.  He further concluded that if the components shown or discussed in the video were combined with a power source – something as simple as AA batteries – such an IED would be capable of causing property damage, personal injury and/or death.

The next day, October 31, 2003, the defendant traveled around the environs of Fallujah with some associates, filming the effects of attacks by *mujahideen*.  For example, the defendant filmed a burnt jeep and interviewed an unknown Iraqi male regarding what had happened.  *See id.*, at E38. The defendant then filmed an overturned train.  The defendant again asked questions of some of the Iraqis at the scene.  The defendant and his associates then started driving from the outskirts of Fallujah into the heart of the city as the defendant filmed and narrated.  As they neared a municipal building, it was under attack by a group of *mujahideen*.  As the building burned and shots were being fired, the defendant filmed the scene and provided narration cheering on the actions of the *mujahideen*.

---

[12]     A copy of SSA Whitworth's report is attached as **Exhibit G**.

These videos have been analyzed by Eric Benn, an expert in imagery analysis and mapping from the Department of Defense. For the night vision videos of October 30, 2003, there are no visible landmarks shown that would allow a determination of the precise location where the defendants and his fellow "*Mujahideen* of Fallujah" planted their IEDs. Accordingly, we cannot say with certainty that those particular IEDs were detonated or whether they injured or killed anyone. What we do know is that, approximately 12 hours after the night vision video was filmed, the defendant and his associates were traveling on a route from the outskirts of Fallujah into the city. Mr. Benn was able to match the images on the defendant's video from October 31, 2003, to known aerial images of Fallujah and to plot the defendant's movements that day on a map (attached as part of **Exhibit H**). When compared to a map showing where all of the IEDs were found or detonated in that area in the two weeks before and the two weeks after October 31, 2003 (also attached as part of **Exhibit H**), it is clear that the defendant and his associates were traveling along the IED "hot spots" the day after the defendant participated in filming his own buried IEDs. The fact that the defendant filmed the attack on the municipal building also permitted Mr. Benn to verify the date stamp on the videos, as that attack is known and publicly reported to have taken place on October 31, 2003.[13] Moreover, using known tables concerning the position of the sun at various longitudes and latitudes at various times of the year, and measuring the shadows shown in the videos, Mr. Benn was able to verify that the time-stamp shown in the video is accurate to Iraq time (as opposed to Dutch time, for example).

---

[13] An aerial image of the attack on the municipal building that day is attached as **Exhibit I**.

**IV.    The Wiretap Evidence**

At the time that the defendant filmed his activities with the *Mujahideen* of Fallujah in October 2003, he was not under surveillance by the Dutch.  Beginning in September 2004, the Dutch police received approval to conduct and maintain wiretap surveillance of the defendant's phone, among other investigative techniques.[14]  In accordance with Dutch law, every four weeks a new application was submitted to request continued wiretap surveillance, citing relevant excerpts from the past month's surveillance and investigation, and those requests were approved by the appropriate Dutch authorities.  The intercepted conversations were mostly in Arabic and were translated into Dutch for the investigators.

The surveillance showed that the defendant had frequent telephone and personal contact with Kahten al Naeme, who operated an auto repair shop in the industrial center in de Isselt, Amersfoort, the Netherlands.  The defendant and al Naeme regularly had conversations about martyrdom and the war.  This was the same individual with whom the defendant had traveled to Iraq in October 2003.

The defendant also had frequent telephone contact with an individual named Fares Nawaf al Issaioui a/k/a Fares Dlimi a/k/a Fares al Dlimi ("Fares"), an Iraqi and apparently an employee of a French media organization.  In conversations between the defendant and Fares, they frequently discussed insurgent attacks in Iraq, operational planning, contact with the insurgents, and video recordings of attacks.  The defendant frequently asked Fares for video footage of attacks, and

---

[14]    As discussed in prior submissions, for example the Government's Opposition to the Defendant's Motion to Suppress, filed on April 14, 2008, the Dutch police initiated their investigation based on Dutch intelligence that the defendant may have participated in the May 2004 beheading of American hostage Nicholas Berg in Iraq.  The Dutch investigation did not develop evidence to corroborate this intelligence and we do not allege that the defendant participated in that offense.

inquired with admiration and zeal about potential attacks and the results of attacks.

For example, in a September 12, 2004, conversation between the defendant and Fares (while Fares was in Iraq), the defendant discussed recent attacks on American troops, and the photos Fares was taking of the attacks. They then had the following exchange:

| | |
|---|---|
| Delaema: | If I get you a video camera, could you film for me? |
| Fares: | A camera would be very useful. Especially the 1500 one. I'd be able to get everything. |
| Delaema: | 1500? |
| Fares: | To get one with a good strong zoom, unlike the old one that I have. |
| Delaema: | I'm going to purchase one and send it to you. |
| Fares: | OK. God is generous. |

Later that same morning, the defendant and Fares had another conversation regarding filming attacks against Americans:

| | |
|---|---|
| Fares: | They just shot down an airplane. |
| Delaema: | Really? Swear! |
| Fares: | I swear. They're parading [a piece of it] on a car in Fallujah. |
| Delaema: | Praise the Lord. Thank God. |
| Fares: | These flies [helicopters] are the ones that have been fucking us. They've been flying all day long over our heads. |
| Delaema: | I tell you, no one was able to shoot down one of them before; this is the first time. I see now that it's happening more often. |
| Fares: | Yes, as if they're falling into traps. |
| Delaema: | A miracle by God. |

| | |
|---|---|
| Fares: | This one came down and they are going around town with it on a car. |
| Delaema: | Good.  Take the camera. |
| Fares: | Yes buddy, I am going to take some pictures. |
| Delaema: | Take a video of it; take the camera from [unintelligible], she may benefit from it. |
| Fares: | I don't have a video camera. |
| Delaema: | Take the camera and take some photos of yourself with her camera. |
| Fares: | OK.  Is it alterable?  May I alter it? |
| Delaema: | Yes, alter it and do live broadcasting for them. |

According to telephonic intercepts, in December 2004, the defendant went to Fallujah where he met with his wife, family, and other unknown individuals.  The defendant stayed for only a short period of time in Iraq before attempting to head back to the Netherlands, but he was arrested in Syria in early January 2005 while in transit.  The defendant was held for several weeks before being released by the Syrians.

**V.      Defendant's Arrest, Search of His Home and Seizure of Evidence**

By April of 2005, the Dutch had decided that it was time to end their investigation and arrest the defendant and several of his associates.  The Dutch wiretaps had uncovered, among other things, numerous conversations between the defendant and Fares discussing their general support of the insurgency, sharing details of particular insurgent attacks after they occurred, and expressing their desire to capture such attacks on film.  Also, the Dutch investigation had uncovered evidence against the defendant and some of his associates of local crimes, such as burglary, assault, and weapons offenses.

On May 2, 2005, Dutch authorities arrested the defendant and three other individuals, and executed searches at their residences and businesses. The defendant was charged with participation in a terrorist organization, possession of firearms and/or ammunition, and assault. During the search of the defendant's home, several Dutch police officers went room by room and marshaled together documents, photographs, and CDs/DVDs, and tagged each item of evidence according to the floor, room, and specific location in which the item was found. The Dutch authorities found voluminous documentary evidence, including financial statements and correspondence, numerous photographs, including photographs of the defendant with other individuals hunting in Iraq and several CDs and DVDs in his bedroom, closet and other locations. Later that day, the Dutch police interrogated the defendant for the first time about the terrorism and local charges against him.[15]

Although the CDs and DVDs seized from the defendant's home were not immediately reviewed by the Dutch police, they included the videos of the defendant's October 2003 trip to Iraq, described above. The Dutch police had also seized several other videos from the defendant's house that contained video footage of events in Iraq. Among these DVD videos are several segments containing original (unprocessed or unedited) footage of insurgent attacks against Coalition Forces. In these segments, the videographer who is recording this footage is working alongside the insurgents during various attack sequences. Indeed, some of this video footage shows a particular scene in which an attack develops from beginning to end. For example, there is a scene in one of the DVD movies in which the videographer is filming a distant road on which large tanker trucks are traveling. The videographer begins to track one of these trucks, which ultimately explodes

---

[15]    A translation of the report of that interview is attached as **Exhibit J**.

(presumably from an IED) as it passes behind a hill.  The videographer then films the smoke billowing into the sky.  Thus, the videographer has advanced knowledge of the attack he is filming. Additionally, on other DVDs found in the defendant's home, there is another sequence of night vision footage of insurgents preparing and burying IEDs – a different video than the one discussed above – as well as deploying rockets for potential attacks.  This video footage is eerily similar to the "*Mujahideen* of Fallujah" night vision video discussed above.  This additional night vision video sequence contains Arabic scrolling across the screen (while the insurgents are assembling/deploying an IED) that translates into "Fallujah the Mecca of Mujahideen, the occupiers' graveyard."

Furthermore, the Dutch police found in the defendant's home DVDs containing original recordings of live musical performances by local Iraqi tribal groups.  Several individuals are shown, in a variety of different scenes, singing and pounding drums.  In some of these scenes, while religious music is playing, the defendant and others can be seen engaging in various Sufi rituals where they put spears, knives, and other objects through the fleshy parts of their abdomen, cheek and other body parts.  As noted in a Dutch report compiled in May 2005,[16] many of the DVDs that contain insurgent attack footage have this same religious music edited into the video sequences. Thus, many of the insurgent, attack-sequence videos in the defendant's possession have been edited to include the tribal music that is featured during the Sufi rituals in which the defendant and his family or associates are participants.

Dr. Bruce Hoffman, a professor in the Security Studies Program at Georgetown's School of Foreign Service and an expert in the field of international terrorism and insurgency groups, devoted

---

[16]    A translation of this report was produced to the defense in December 2007 and can be found at H2-073 - H2-078.

a chapter of his book *Inside Terrorism* (2006 ed.), to the topic of "The New Media, Terrorism, and the Shaping of Global Opinion."[17]  In this chapter, Dr. Hoffman discusses the value of propaganda to terrorists and insurgent groups.  As he explains, these groups use the Internet and videos/DVDs for propaganda, recruitment, training and planning purposes.  Terrorist and insurgent groups use Iraqi attack footage and religious videos, for example, to further their cause and recruit new members.  Indeed, since the inception of the Iraq war in 2003, these groups have substantially enhanced their use of the Internet and other video media to further their political, religious and military aims.  In order to produce videos that fulfill these goals, it stands to reason that a videographer can be an extremely important part of an Iraqi insurgency or terrorist cell.

An examination of the videos seized from the defendant's home makes clear that many of those videos contain precisely the kind of *jihadi* footage that insurgent and terrorist groups create and distribute for propaganda and recruitment purposes.  Considering the fact that the defendant's video collection contained both "raw" and "finished" *jihadi* materials, as observed by the Dutch police, viewed in combination with the wiretap calls between the defendant and others, including Fares, the government believes that it is reasonable to infer that the defendant played a role in producing propaganda and training materials for the insurgency whose ultimate goal was to kill Americans in Iraq.

## VI.    The defendant's many excuses

In addition to their interview of the defendant on the date of his arrest, the Dutch police interviewed the defendant in custody on May 11, 2005, May 31, 2005, and June 28, 2005.  Each of

---

[17]      With Dr. Hoffman's permission, this chapter of his book is attached as **Exhibit K**.

these three interviews was video recorded.[18]    During those interviews, Delaema discussed the

October 2003 trip and videotapes, and voluntarily identified himself on the videotapes.

From the very first interview on the day of his arrest, through the subsequent interviews with

law enforcement, to his conversations with prison guards, and even with Dutch journalists, he

continued to offer a variety of mutually-exclusive excuses for his "*mujahideen*" video – each more

implausible than the last.   In the end, it was clear that none of these excuses in isolation was

believable, and in combination, they were simply absurd.

When he was arrested, it was clear from both his statements and his demeanor that he was

confident that he would be released shortly.  At the time of that initial interview in the hours after

his arrest, the Dutch police had not yet reviewed the videos in his collection and thus had not yet

seen the night vision IED video.  As a result, they were not in a position to ask any questions about

it.  Rather, they asked him more general questions based on information they had gleaned from the

wiretap investigation.  The defendant said that he did not want to talk about the local assault and

firearms charges, but did want to "talk about the big case."  **Exhibit J.**  He then essentially admitted

to his guilt with respect to the local charges, saying things like: "I was told that I am here because

of assault and battery.  I know what you mean.  Together with my friend Khathem, I beat up an

Iranian because he stole a laptop from our business." *Id.*  He also admitted to doing "some punching

for" a friend in a café, emphasizing that he is a good fighter.  *Id.*  He did also discuss "the big

case"briefly – claiming to have known that his phone was being wiretapped and that he was being

followed.  *Id.*  He also admitted to being "against America" but claimed that he was being arrested

---

18    English transcripts of each of these interviews are attached as **Exhibits L, M, and N**,
respectively.

"for no reason." *Id.*

By the time of the second interview, the Dutch agents had discovered the night vision IED video. It was in this interview that the defendant's tone began to change, from carefree at the outset, to increasingly evasive as he was confronted with his actions and statements on that video, to ultimately agitated as Dutch detectives pressed him on the illogic of his excuses.

### 1.    I was serving as an interpreter for an American journalist.

When he was first confronted with the existence of the night vision IED video, the defendant claimed not to know what the detectives were speaking about. The police reminded him that in his house was a videotape of him in the company of "masked men" in Fallujah. *See generally* **Exhibit L,** at 38:26-47:23. The defendant ultimately "remembered" making this video, but then provided excuse number one:

> Delaeama:    This is just . . . explanation with . . . uh . . . there was a journalist, also actually on TV I think . . . because, uh . . . was a journalist who . . . I had to help him make the film. It is in Fallujah.
>
> de Greef:    A journalist?
>
> Delaema:    Yes.
>
> de Greef:    Who was that?
>
> Delaema:    That was uh . . . I think it was an American . . . I think.

*Id.*, at 46:25-46:44. A moment later, the defendant added more to this explanation:

> de Greef:    Then surely they wouldn't allow any Americans to come there, would they?
>
> Delaema:    They did at first . . . Americans, everything . . . French and so on . . . they can . . . when . . . show something to them, what they do and so on. Then they won't . . . be difficult with you. But because I speak English, you know . . . I had to translate for them."

de Greef:      In English?

Delaema:       Yes.

de Greef:      We didn't see or hear any of that.

Delaema:       No that's right.

*Id.*, at 47:56-48:29.  This excuse was laughable.  First, and most importantly, the defendant was not heard speaking English on the night vision IED video; nor was anyone else.  The video was entirely in Arabic.  Further, the defendant stated early on in this same interview that he spoke only "a little" English, *id., at* 11:28-29, making him a poor choice for an English interpreter.  Finally, there was no other individual on the video asking questions.

### 2.      I myself was a journalist.

Through a series of questions, the defendant's explanation for his actions with the men who called themselves the *"Mujahideen* of Fallujah" evolved from his "interpreter" excuse to a claim that he himself was the journalist.

Zuidema:       Other than the film . . . what's going on there, what are you all doing there?  At night, wearing masks?

Delaema:       I'm not doing anything . . . I, I, I . . . just take their . . . statement, what are they doing and I talk about them . . . those guys, they fight and they do that, because uh . . . and then it happens that and . . . a lot against Americans.  So I just take their statement and . . .

Zuidema:       You're doing an interview then?

Delaema:       Yes so, as you can see.

Zuidema:       So you're actually a journalist at that moment?

Delaema:       You could see it that way.

de Greef:      So why are you wearing a mask, then?

Delaema:        Yes, I uh . .. I was just, uh . . .

de Greef:       Just wearing a mask?  Just wearing a mask?

Delaema:        No, not just . . . I just afraid . . . because, uh . . . yes, just afraid, I
                don't know why, but just afraid.

*Id.*, at 52:34-53:13.

This excuse, too, was absurd.  A journalist does not jump in front of a video camera with his face shrouded in a mask and state, "We, the Mujahideen of Fallujah, have a plan, God willing, for today."  *See* **Exhibit**, at E18.  Nor does a journalist pose silently with his arm draped over the shoulder of one of his subjects, while someone else films and speaks.  Further, despite his claims in this second interview that he himself was a sometime-journalist, when asked his occupation just nine days prior by the same interrogator, Detective de Greef, the defendant stated, "I also worked here as a hairdresser, a waiter, in several businesses.  At this time I receive partial disability because of my hand, and I work part time at Autoschade Isselt, a business in Amersfoort that does damage repairs. . . .  I want to return to my own kind of work, as a hairdresser."  In addition, his long-time girlfriend – with whom he was still involved at the time that he traveled to Iraq, married Zina, and made the night vision IED video, and who saw him several times a week during that timeframe – stated that he never expressed an interest in being a journalist.  Rather, she said that his ambition was to open a hair salon with her, as she too was a hairdresser.  It is, of course, true that on the night vision IED video the defendant asked questions of other members of the *mujahideen*.  However, these questions were necessary to elicit information for making the how-to-design-and-deploy-an-IED video that the defendant now admits he was making.

**3.    They kidnaped me and beat me up and forced me to make this video for them.**

When it was clear that the interrogating detectives were not buying the first two excuses the

defendant was selling, he quickly melded in a third excuse – that he was beaten up:

> In the beginning, they, uh, beat me up, you know . . . they thought that
> I was a spy.  I explained that I didn't have anything to do with and so
> on, so on, so on.  And [they] knew that I speak English, so they took
> that journalist with them in order to . . . so I actually was a sort of aide
> to that journalist.

*Id.*, at 53:33-53:55.  He later added in that he wasn't just beaten up, he was kidnaped from his step-

mother's home and <u>then</u> beaten up:

| | |
|---|---|
| de Greef: | But how do you become involved with individuals of that type? Because you are exposed to great danger if someone catches them. |
| Delaema: | [to interpreter] tell him that it is them who came and took me from my home. |
| de Greef; | You were picked up, just like that? . . . At your step-mother's?  You were at your step-mother's? |
| Delaema: | Yes. |
| de Greef: | And then all of a sudden there were people at the door? |
| Delaema: | They took me with them. [to interpreter] tell him that they were the force.  They are who control the area. |

*     *     *

| | |
|---|---|
| Zuidema: | Well, was there violence involved when they came to get you? |
| Delaema: | Yes. |
| Zuidema: | What kind of violence? |
| Delaema: | Kalashnikovs. |
| de Greef: | Did they threaten you with those? |

Delaema:    Yes. . . .  I had to go with them.  I went with them.

*Id.,* at 1:17:42-1:20:04.  When the detectives confronted the defendant with why he, for example, joined in making the *jihadi* speeches, the defendant claimed: "Yes, but how can I say it in front of the camera: 'Hey guys, I'm scared, I'm under duress, those guys are going to kill me.'  I have to make those images."  *Id.*, at 1:23:05.

This latest in his long succession of frivolous explanations was again undercut by the night vision IED video itself.  In this video, the defendant was heard explaining to a comrade how to operate his video camera, *see* **Exhibit E**, at E15-E17, and then seen literally jumping in front of the camera to make an unprompted *jihadi* rant against the United States, saying things like "with God's help, and if the Americans enter, we will hit them with timed mine, by way of remote. . . . Controlled by remote from afar, God willing, if the hit is successful, we will hunt them."  *See id.* at E19.  Indeed, in another segment of the video, he actually had his arm around another of the *mujahideen* in what might be considered a "crew photo" as another individual off-camera said, "Allah said 'against them make ready your strength to the utmost of your power, including steeds of war, to strike terror into the enemies of Allah and your enemies.'" *See id.*, at E31.  And later, when they were actually digging up IEDs on the video, the defendant demonstrated the bomb they are unearthing, stating "this is another IED," and then he directed the cameraman to "[f]ilm the ground."

Further, the next day, the defendant, no longer in the company of his "captors," actually went back out on the roads around Fallujah, filming the destruction caused by other devices.  For example, he filmed a burned out train, stating "This is a burnt American vehicle.  It was set on fire by the *Mujahideen* of Fallujah." *See id.*, at E38.  Finally, these captors let him keep the tape of his alleged "captivity."  These are hardly the actions of an abused kidnap victim, but rather the voluntary choices

of a willing participant.

### 4.     That bomb video was just a joke.

Once the defendant got to prison, he changed his tune yet again.  No longer was he (a) an interpreter; (b) a misunderstood journalist;  (c) a victim of *jihadi* kidnapers; or (d) a beaten, kidnaped, misunderstood, interpreting journalist.[19]  Rather, he was just a prankster.  As he told a prison guard, "he had been joking around with a few friends in Iraq and had made some kind of al Qaeda film with them."  A bomb-planting video is hardly a laughing matter.  And further, this video was recovered from his home nestled among a collection of videos ranging from Chechen beheadings of Russians, to those depicting IEDs detonating on tanker trucks passing by, to others depicting insurgents launching attacks with rocket-propelled grenades (RPGs).  It is no wonder that this excuse for his violent behavior was particularly short-lived.

### 5.     There weren't any Americans in the area anyway.

Finally, according to the defendant, even if none if his excuses for his bomb-planting activities with the *Mujahideen* of Fallujah were accepted, there really was no harm because the Americans were not in the Fallujah area in the fall of 2003.  "They didn't come, because the Americans, they're not in the village, not since nearly a year before the pictures were taken."

**Exhibit L**, at 1:11:49-55.  Quite to the contrary, there was a strong American military presence in

---

[19]     The defendant's habit of embellishment continued throughout his incarceration in the Netherlands, as he fought his deportation to the United States on these charges.  For example, in a call recorded early in his incarceration at Krimpen ad Ijssel, in elaborating on a hybrid of a number of his excuses, the defendant told his wife Zina that the "terrorists" who kidnaped him actually made a video of that kidnaping.  And further that "[t]he first time they wanted to kill me, before I videotaped them.  Also in that video, they said if I ever messed with them, they would kill my family.  They also said they would show the video to all of Fallujah.  Because in that video, I confessed to being a spy for Holland.  They were beating me so badly . . . ."  Call 2833848, the English transcript of which is attached as **Exhibit O**.

and around Fallujah during that time.  Indeed, in the two weeks before and the two weeks after the date of the night vision IED video, 28 IEDs were recovered; at least 20 actually detonated; 22 soldiers were wounded by roadside bombs; and eight were killed by them.  *See* **Exhibit H.**  For example, on November 2, 2003, just three days after the night-vision video, an IED exploded in Fallujah, killing two American soldiers and wounding a third.  *Id.*  In light of the night vision video itself, in combination with the series of mutually-exclusive, incredible explanations regarding his role in that video, this attempt at minimizing his involvement in the IED video was particularly weak.

## VII.    Conclusion

Wesam al Delaema has now pleaded guilty to conspiracy to murder United States nationals outside the United States because that is precisely what he did.  Along with a group of men from his native village, through his words of *jihad* and his actions – both in plotting to detonate roadside IEDs and creating propaganda videos to urge others to do the same – he agreed to kill United States citizens.  While we cannot point to a specific detonation of an IED that we can prove the defendant caused, the actions he took were dangerous and contributed to the considerable violence against

Americans in Iraq.  A sentence of 25 years is appropriate under the totality of the circumstances of

this case.

Respectfully submitted,

JEFFREY A. TAYLOR
UNITED STATES ATTORNEY
D.C. Bar No. 498-610

By:        /s/                             
GREGG A. MAISEL
Assistant United States Attorney
D.C. Bar No. 447-902
National Security Section
555 Fourth Street NW, Room 11-453
Washington, DC 20530
(202) 514-7746
Gregg.Maisel@usdoj.gov

RACHEL CARLSON LIEBER
Assistant United States Attorney
D.C. Bar No. 456-491
National Security Section
555 Fourth Street NW, Room 11-909
Washington, DC 20530
(202) 353-8055
Rachel.Lieber@usdoj.gov

DAVID I. MILLER
Trial Attorney
N.Y. Bar # 2959369
Counterterrorism Section
U.S. Department of Justice
10th & Constitution Avenue, N.W.
Washington, D.C. 20530
(202) 353-2440
David.Miller@usdoj.gov

Dated: April 3, 2009